UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CENTRAL DIVISION

No. 05-40073-FDS

| | |
|---|---|
| JAMES J. SANDLER, Individually and as Trustee of the TOWN PAINT & SUPPLY CO., INC. 401(k)/PROFIT SHARING PLAN, and TOWN PAINT & SUPPLY CO., INC., <br><br>Plaintiffs, <br><br>v. <br><br>CIPC SYSTEMS, INC. and RICHARD A. PERRY, <br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## AMENDED COMPLAINT AND JURY DEMAND

### Introduction

1.      This Complaint states causes of action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., as well as supplemental causes of action that arise under federal common law and under state law for professional negligence, contribution, and indemnification.

2.      James J. Sandler, is a trustee, participant, and beneficiary of the Plaintiff Town Paint & Supply Co., Inc. 401(k)/Profit Sharing Plan (the "Plan"). Town Paint & Supply Co., Inc. ("Town Paint") is the relevant employer and sponsor of the Plan (the "Sponsor"). Together, Sandler, the Plan, and the Sponsor bring this action on behalf of the Plan to recover injuries suffered by the Plan, its participants and beneficiaries, as a result of the Defendants' breach of their duties to the Trustee, the Plan, and the Sponsor. The Defendants, as the Plan's Third Party

Administrator ("TPA"), failed properly to conduct tests and to report properly the results of those tests to determine whether the Plan was in compliance with requirements set forth by the IRS Code and corresponding Regulations, namely requirements concerning "top-heavy" 401(k) Profit Sharing Plans. The defendants also failed to advise what steps the Plan, its Trustees, and its Employer/Sponsor ought to take to address the "top-heavy" nature of the Plan. One of the options to address the "top-heavy" nature of the Plan was for the Employer/Sponsor to make prescribed contributions to the Plan. The Defendants failed properly to advise Town Paint as to the need for any amount of contributions required to be made to the Plan. Indeed, for more than a decade, Defendants failed to conduct the proper tests and failed to report results of proper testing. When Defendants' repeated errors were eventually discovered, the only option to avoid a tax and benefits catastrophe for the Plan and its participants was to make retroactive payments to the Plan by the Employer/Sponsor to avoid the dire consequences of Plan invalidity. The Plan suffered substantial injury in the form of reduced assets and lost earnings together totaling over $320,000. To avoid Plan invalidity and in exchange for an assignment of the Plan's claims against the Defendants, the Plan's Sponsor agreed to make up the contributions and the missing earnings to the Plan.

3.     The services that the Defendants provided <u>to</u> <u>the</u> <u>Plan</u> were predominately retrospective and/or contemporaneous. For instance, as TPA, the Defendants prepared the Form 5500 tax return for the Plan, handled employee/participant withdrawals, rollovers, and questions regarding the Plan. In addition to their work for the Plan <u>qua</u> Plan, the Defendants also offered advice and guidance to Town Paint, the employer/sponsor of the Plan, and to the owners of Town Paint, the members of the Sandler family. These services were supposed to be forward-looking. Thus, for instance, if the Defendants saw that the Plan was going to become

"top-heavy" the Defendants had undertaken to advise Town Paint and its owners of the steps that Town Paint could take to avoid this status or how best to address potential "top-heavy" status on a long-term, going-forward basis. In essence, this service was the benefits equivalent of "tax planning." Because the Defendants never did the proper testing, they never saw or foresaw that the Plan was or was going to become "top-heavy" and therefore they never advised Town Paint how to avoid such "top-heavy" status or how to accommodate such "top-heavy" status. This was professional negligence. Thus, Town Paint suffered substantial injury as a result of the Defendants' professional negligence and incompetence.

**Parties**

4. The Plan is a 401(k)/Profit Sharing Plan that was established by Town Paint as an employer for the benefit of its qualified participating employees.

5. Town Paint is a Massachusetts corporation with its principal place of business at 35 Lyman Street, Northboro. Town Paint employs several score employees. Town Paint is the Sponsor of the Plan.

6. James J. Sandler is a citizen of Massachusetts, who resides in Framingham. James Sandler is a Trustee, participant, and beneficiary of the Plan. At all relevant times Mr. Sandler has been an owner and principal of Town Paint, along with other members of the Sandler family.

7. Upon information and belief, Defendant CIPC Systems, Inc. ("CIPC") is a Massachusetts corporation with its principal place of business at 250 Hampton Street, Auburn.

8. Upon information and belief, Defendant Richard A. Perry is a Massachusetts resident who lives at 195 Chester Street, Worcester. Mr. Perry is an officer and director of CIPC, and holds himself out as an employment benefits professional and a Chartered Financial

Consultant ("ChFC"), Chartered Life Underwriter ("CLU"), and a Qualified Pension Accountant ("QPA").

## Jurisdiction

9.  The Plaintiffs have jurisdiction to bring this action against the Defendants pursuant to 29 U.S.C. § 1132, including but not limited to subsection (a)(2).

10. Pursuant to 29 U.S.C. § 1132(e), this Court has the subject matter jurisdiction to resolve the Plaintiffs' claims brought under ERISA.

11. Pursuant to 28 U.S.C. § 1132(g), in addition to entering a judgment awarding the Plaintiffs their monetary damages in the form of the missed contributions, earnings, and costs incurred in recalculating the contributions and earnings, this Court has the authority to award the Plaintiffs their costs and attorney's fees incurred in prosecuting this action along with any other such equitable relief.

12. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to resolve the Plaintiffs' other related claims under federal common law and state law as all such claims involve the same parties and arise out the same transactions, controversy, and common facts.

## Facts

13. Well before 1992, Town Paint established the Plan for the benefit of its employees and for the benefit and good will it engendered among its long-time employees. Since Town Paint is a relatively small, privately-held company, it did not have an extensive Human Resource department but rather, it relied on outside professionals to advise it regarding employee matters, including employee benefit plans. Starting in or about 1992, Town Paint engaged the Defendants to serve in two capacities: (i) as the TPA for the Plan and (ii) to give Town Paint advice on how it could address the Plan and its costs long-term.

14. An integral part of serving both as the Plan's TPA and to advise Town Paint on how to plan for the Plan long-term, was (i) doing annual testing to determine whether the Plan was top-heavy, and (ii) if the Plan was top-heavy, or was going to become so, as many plans are, to advise Town Paint with respect to the impact of such top-heavy status and the several potential options open to Town Paint. The Defendants undertook to perform such testing and to provide such advice to Town Paint.

15. A defined contribution profit-sharing plan subject to the requirements of IRS Code 401(k) is deemed to be "top-heavy" if 60% or more of the benefits or account balances accrue to "key employees." Key employees include all employees who own at least 5% of the business or earn in excess of set amounts. Key employees also include all of the spouses, children, grandchildren, and parents of employees owning at least 5% of the business as described above. In general, _if_ a plan is top-heavy in any particular year _and_ the sponsor is making _any_ form of contribution to the plan, a "minimum contribution" for the benefit of each participating employee must be calculated and contributed to the plan under the applicable rules and regulations. If a sponsor fails to comply with these top-heavy rules and regulations, the plan may lose its tax-exempt status. The loss of tax-exempt status for a plan would have disastrous consequences for a plan. For instance, it would mean that monies received by the participants in the plan would be taxed immediately rather than being tax-deferred or tax-exempt. If loss of tax-exempt status is retroactive, it would entail many years in taxes, penalties, and interest for each participant and the Plan itself.

16. Pursuant to 29 U.S.C. § 1002(21)(A), by acting as the Plan's TPA, and in performing the noted services as TPA, the Defendants were fiduciaries (or sub-fiduciaries) of the Plan as defined by ERISA and they owed the Plan the fiduciary duty to perform the above

5

services and provide the above advice in a competent, professional manner.  Similarly, the Defendants owed similar professional, non-ERISA – based duties to Town Paint regarding the benefits planning advice that was also to be based on such testing.

17. In connection with the benefit planning nature of their work, the Defendants understood they were to, and did, communicate with Town Paint with an eye on the future consequences of contemporaneous actions.  For instance, in a letter dated September 3, 1993, the Defendants informed Town Paint that they had completed the top-heavy testing for the Plan's Fiscal Year 1992.  (A true and accurate copy of this letter is attached hereto as Exhibit A.)  In this letter, the Defendants addressed "potential top-heavy issues," but assured Town Paint that the Plan was not top-heavy for that year.  Indeed, the September 3, 1993 letter also stated that future top-heavy status for the Plan may be delayed or avoided by having two key employees, Messrs. David Sandler and James Sandler, withdraw amounts "rolled over" into the Plan from a different plan, the Sandler Realty plan.  The letter did not note that any other actions, such as the withdrawal of benefits to key employees, were needed to avoid top-heavy status.  In response to the September 3, 1993 letter, and based on the Defendants' advice, Messrs. David Sandler and James Sandler withdrew from the Plan the amounts rolled over from the Sandler Realty plan.  Because they were not advised that anything else needed to be done, they took no other action to avoid or delay top-heavy status for the Plan.

18. The September 3, 1993 letter was fatally erroneous.  In 1992, the Plan was already top-heavy.  Because the Plan was already top-heavy, Town Paint was required to make minimum "top-heavy" contributions to the Plan and the failure to do so in 1993 jeopardized the Plan's on-going tax-exempt status.  The removal of the "rolled-over" Sandler Realty amounts did not cure the Plan's top-heavy status.  Indeed, any proper testing of the Plan would have disclosed that the

6

Plan was both "top-heavy" and likely to remain so for the foreseeable future. More importantly, however there were several actions that Town Paint could have taken in 1993 to avoid any future liability for top-heavy contributions for the Plan. But, because the Defendants did not test the Plan properly, the Defendants never recognized this and never advised Town Paint of the various steps it could take to eliminate its future liability for minimum contributions.

19.     In each year subsequent to 1993, the Defendants, both as part of their engagement as the Plan's TPA and also to advise Town Paint, performed top-heavy testing for the Plan for the prior fiscal year. At no time did the Defendants recognize that the Plan was "top-heavy" and at no time did the Defendants advise Town Paint of the steps it could take to prevent any liability for top-heavy minimum contributions.

20.     In 2004, Town Paint engaged its accountant and an outside record-keeper to review the Plan's records. Based on this review, Town Paint's accountant determined that the Defendants had not properly tested the top-heavy status of the Plan, and that the Plan had likely been top-heavy as early as 1992.

21.     Subsequently, the Plaintiffs hired a new TPA, among other things, (i) to retest the top-heavy status of the Plan and (ii) to calculate the amounts of contributions and earnings Town Paint was required to contribute retroactively to the Plan to protect the Plan's tax exempt status.

22.     The new TPA determined that the Plan was indeed top-heavy as early as 1991.

23.     If Town Paint had known in advance that the Plan was top heavy and was likely to remain so for the foreseeable future, there are numerous steps it could have taken to address this situation, including, without implied limitation, (a) encouraging and incentivizing non-owners to participate more fully in the Plan, (b) encouraging and incentivizing owners not to participate as fully in the Plan, (c) slowing the increase in compensation for employees over the

years and devoting such funds to minimum contributions, (d) halting all Sponsor contributions to the Plan, or (e) terminating the Plan.  Addressed on a forward-looking basis, Town Paint could have avoided top-heavy status for the Plan altogether, it could have made provisions to make the minimum contribution out of its total employee compensation pie, or it could have taken another step that would have avoided liability for minimum contributions.

24. However, because the Defendants never did the proper testing and never advised Town Paint or the Plan that the Plan was "top-heavy" over the course of more than a decade of services to Town Paint and the Plan, Town Paint and the Plan's options for how to address the Plan's "top-heavy" status, when it was discovered, were extremely limited.  Basically, the Plan was faced with the prospect of either (a) losing its tax exempt status for the last dozen years, which would have had disastrous consequences for all participants, the Plan, and Town Paint, or (b) employing various professionals and making retroactive payments of a dozen years of minimum contributions, foregone earnings, and various other interest and other costs.

25. As a result, Town Paint, to protect the Plan's tax-exempt status, voluntarily informed the IRS of the recalculations and requested authorization from the IRS to make retroactive payments to the Plan to protect the Plan's tax-exempt status.  These retroactive payments include $251,993.95 in additional minimum top-heavy contributions and $71,948.92 in earnings on the contributions.  These amounts are calculated as set forth in Exhibit B.

26. To date, the Plaintiffs have incurred a significant amount of professional fees and costs to retest the top-heavy status of the Plan and to prepare and submit an application to the IRS for authorization to make retroactive payments.  These fees and costs include over $15,000 in legal fees, $20,000 in new professional and TPA fees, thousands of dollars in accountants'

fees, and a $5,000 IRS application fee. These amounts do not include the substantial legal fees that Plaintiffs will incur as a result of their efforts to recover against the Defendants.

COUNT I<br>
(Breach of Fiduciary Duty to the Plan, Its Participants,<br>
Beneficiaries and Trustee under ERISA)

27. The Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 26, above.

28. As described above, each of the Defendants was a fiduciary or sub-fiduciary of the Plan.

29. Among other things, Section 404(1) (emphasis added) of ERISA requires a Fiduciary to:

"discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --

   (A) for the exclusive purpose of:

      (i) providing benefits to participants and their beneficiaries; and

      (ii) defraying reasonable expenses of administering the plan;

  (B) with *the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

30. Pursuant to 29 U.S.C. § 1109: (emphasis added)

"Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be *personally liable* to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

31. Specifically, the Defendants had a duty properly to conduct top-heavy testing and to advise the Plan, its Sponsor, and Trustees, as to the results of such testing and, where necessary, the appropriate amount of minimum contributions to be made to the Plan.

32. The Defendants breached their fiduciary duties by failing properly to conduct top-heavy testing and by failing to provide adequate advice to the Plan, its Sponsor, and its Trustees regarding the minimum contributions to the Plan.

33. As a result of the Defendants' breach of their duties, the Plan, its participants and beneficiaries, have suffered significant damages and would have suffered still more damages. Specifically, the Plan has been under-funded. To mitigate the damages suffered by the Plan, its participants and beneficiaries, Town Paint agreed to advance for the Plan twelve years of missing minimum contributions and earning hereon, plus various other costs and fees, in exchange for the assignment of the Plan's rights to pursue the Defendants.

## COUNT II
(Professional Negligence to Town Paint)

34. The Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 33, above.

35. The Defendants were engaged by Town Paint to provide benefits advice and services in the design and operation of the Plan. Under the terms of this engagement, the Defendants were hired to test the top-heavy status of the Plan and to provide forward-looking advice to Town Paint should it be determined that the Plan was top-heavy or likely to become so.

36. As such, the Defendants owed Town Paint a duty of care to advise it and to perform professional services in a reasonable and diligent manner in accordance with the reasonable practice of similar professionals in a comparable situation.

37. As described herein, under federal common law and state common law, the Defendants breached their duty of care to Town Paint and failed to provide professional services in a reasonable and diligent manner in accordance with the reasonable practice of similar professionals in a comparable situation. The Defendants' breach of their duties of care constitute professional negligence.

38. As a result of the Defendants' breach of their duty and as a result of their professional negligence, Town Paint suffered significant damages as described herein.

COUNT III
(Negligent Misrepresentation to Town Paint)

39. The Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 38, above.

40. In providing professional services for Town Paint, the Defendants made material representations, including those concerning the top-heavy status of the Plan. The Defendants, however, knew or should have known that their representations to Town Paint were incorrect. The Defendants also failed to advise of various matters on which they had an obligation to advise Town Paint.

41. At all relevant times, Town Paint reasonably relied upon the Defendants' representations in the operation of the Plan and in not planning for the Plan as top-heavy.

42. As a direct result of the Defendants' misrepresentations, under federal common law and state common law, Town Paint has suffered significant damages as described herein.

## COUNT IV
### (Indemnification)

43. The Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 42, above.

44. Due to the actions of the Defendants, Town Paint was required, as described above, to make additional, retroactive contributions and payments to the Plan.

45. Because the contributions and payments required to be made by Town Paint are the direct result of the actions of the Defendants, the Defendants are obligated to indemnify Town Paint respect to such contributions, payments, and claims.

## COUNT V
### (Contribution)

46. The Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 45, above.

47. Due to the actions of the Defendants, Town Paint was required, as described above, to make additional, retroactive contributions and payments to the Plan.

48. To the extent that Town Paint is responsible to make such contributions or payments, the Defendants are jointly responsible for such contributions, payments or damages.

49. Therefore, the Defendants are obligated to Town Paint for their pro-rata share of the contributions, payments or damages pursuant to G.L. c. 231B and under federal common law.

WHEREFORE, the Plaintiffs demand judgment as follows:

    A. Judgment against the Defendants in favor of the Plan, and its assigns, on Count I for the full amount of the damages suffered by the Plan and the other plaintiffs plus interest;

B. Judgment against the Defendants in favor of Town Paint on Counts II - V for the full amount of damages suffered, plus interest;

C. An award to the Plaintiffs of their attorney's fees and costs under applicable law; and

D. Any other relief that this Court deems just and appropriate.

## JURY DEMAND

The Plan demands a trial by jury on all claims so triable.

JAMES J. SANDLER, Individually and as Trustee of the TOWN PAINT & SUPPLY CO., INC. 401(k)/PROFIT SHARING PLAN, and TOWN PAINT & SUPPLY CO., INC.,

By their attorneys,

/s/ Anthony B. Fioravanti
_____
Richard J. Yurko (BBO# 538300)
Anthony B. Fioravanti (BBO# 664823)
YURKO, SALVESEN & REMZ P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
(617) 723-6900

Dated: June 6, 2006

**HPC Systems, Inc.**
*Benefit Plan Consultants & Administrators*

HAMPTON PLACE, 250 HAMPTON STREET, AUBURN, MA 01501   508-832-2299   FAX 508-832-9885

September 3, 1993

Mr. David Lappin
Town Paint & Supply Co., Inc.
35 Lyman Street
Northboro, MA 01532

Re:   Sandler Realty Trust Rollover Accounts

Dear David:

    Hope you had an enjoyable vacation and that you have had the opportunity to catch up with your work this past week. As promised, I am writing concerning the potential "top heavy" issues with regards to the company's 401(k) plan.

    The Internal Revenue Code (Section 416(a)) provides that a plan is deemed to be "top heavy" if the assets allocated to the key employees equals or exceeds 60.00% of the total of plan assets. If this occurs, the company is <u>required</u> to make a contribution equal to 3.00% of compensation for <u>all eligible employees</u>. It is critical to remember that this includes not only those employees who are participating in the 401(k) plan by virtue of payroll deductions, but all employees who have satisfied the age and service requirements (age 21 with one year of service). If the plan had been "top heavy" last year, this would have meant a mandatory company contribution of $46,301.74 (total eligible compensation of $1,543,391.34 x .03).

    In order to delay, and hopefully potentially avoid, the plan becoming "top heavy" it is essential that the rollover amounts for Jim and David Sandler be withdrawn from the plan and placed in IRA accounts. In fact, these funds should have never be rolled over into the 401(k) plan in the first place. Funds for any other key employees who are no longer employed should also be rolled over to IRA accounts (such as, James Mark Sandler and Stephanie Sandler), as this would provide additional help in this area. These additional distributions, however, would still need to be taken into account for the next five (5) years. However, it is better to start now than alter.

    With that end in mind enclosed please find a summary sheet for an annuity contract that may be useful as a rollover vehicle. This contract maintains the same type of fixed rate account that both Jim and David have been using for their existing 401(k) plan monies. Please note that any surrender charges are waived for a bona fide retirement or death benefit payment.

Mr. David Lappin
September 3, 1993
Page 2

      Once you have had the chance to review this material with Jim and David please let me know how they would like to proceed, or if they have any questions. Obviously alternative investment accounts are available if they desire something other than fixed rate accounts.

Sincerely,


Richard A. Perry, CLU, ChFC, QPA
Executive Vice President

RAP/jh

## Town Paint & Supply Co., Inc.
### Top Heavy Summary

| Year | Top Heavy Percentage | Top Heavy Contribution | Gain/Loss Percentage | Gain/Loss Contribution |
|------|---------------------|------------------------|----------------------|------------------------|
| 1991 | 67.94% | 15,734.24 | 7.53% | - |
| 1992 | 62.87% | 19,668.71 | 6.29% | 1,152.24 |
| 1993 | 65.23% | 16,700.81 | 7.39% | 1,678.60 |
| 1994 | 63.86% | 16,772.45 | 5.49% | 3,259.75 |
| 1995 | 66.24% | 22,585.14 | 6.82% | 5,786.93 |
| 1996 | 66.25% | 23,556.02 | 3.90% | 4,584.18 |
| 1997 | 66.83% | 15,419.36 | 2.69% | 3,418.98 |
| 1998 | 68.49% | 20,504.79 | 6.71% | 11,394.22 |
| 1999 | 65.86% | 21,507.36 | 7.91% | 18,976.07 |
| 2000 | 66.68% | 20,234.62 | 3.26% | 1,569.28 |
| 2001 | 69.35% | 19,822.23 | 2.76% | 1,223.69 |
| 2002 | 75.95% | 18,775.82 | 1.05% | (6,912.35) |
| 2003 | 78.62% | 20,712.41 | 7.12% | 25,817.32 |
|      |        | 251,993.95 |      | 71,948.92 |